AO 106 (Rev. 04/10) Application for a Search Warrant

AUSA Erin Kelly, (312) 886-9083

**FILED**
7/24/2023
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

In the Matter of the Search of:

the Apple MacBook Air laptop computer, further described in Attachment A

Case No.   **23 M 728**

Ref. No. 2023R00571

# APPLICATION AND AFFIDAVIT FOR A SEARCH WARRANT

I, Mikhail Geyer, a Task Force Officer of the Drug Enforcement Administration, request a search warrant and state under penalty of perjury that I have reason to believe that on the following property or premises:

**See Attachment A**

located in the Northern District of Illinois, there is now concealed:

**See Attachment B**

The basis for the search under Fed. R. Crim. P. 41(c) is evidence.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 21, United States Code, Sections 841(a)(1) and 846 | Narcotics |

The application is based on these facts:

**See Attached Affidavit**,

Continued on the attached sheet.

_____
*Applicant's Signature*

MIKHAIL GEYER, Task Force Officer
Drug Enforcement Administration
*Printed name and title*

Pursuant to Fed. R. Crim. P. 4.1, this Application is presented by reliable electronic means. The above-named agent provided a sworn statement attesting to the truth of the statements in the Application and Affidavit by telephone.

Date:  July 24, 2023

_____
*Judge's signature*

City and State: Chicago, Illinois

SUNIL R. HARJANI, U.S. Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT )       **23 M 728**

                                  )       ss

NORTHERN DISTRICT OF ILLINOIS )

## AFFIDAVIT

I, Mikhail Geyer, being duly sworn, state as follows:

1.     I am a Task Force Officer with the Drug Enforcement Administration ("DEA"). I have been so employed since approximately July 2018. I am also employed by the Evanston Police Department in Evanston, Illinois.

2.     As part of my duties as a DEA Task Force Officer, I investigate criminal violations relating to narcotics trafficking offenses, including criminal violations of the Federal Controlled Substance laws, including, but not limited to Title 18, United States Code, Sections 1956, and 1957, and Title 21, United States Code, Sections 841 and 846. I have been involved with various electronic surveillance methods, the debriefing of defendants, informants, and witnesses, as well as others who have knowledge of the distribution, transportation, storage, and importation of controlled substances.

3.     I have received training in the area of narcotics investigations, money laundering, financial investigations and various methods which drug dealers use in an effort to conceal and launder the proceeds of their illicit drug trafficking enterprises. I have participated in numerous investigations involving violations of narcotics laws.

4.     I have participated in investigations that have led to the issuance of search warrants involving violations of narcotic laws. These warrants involved the search of locations  and items such as residences of targets, their associates and relatives, "stash houses" (houses used as drug/money storage locations), storage

facilities, bank safe deposit boxes, cellular/camera phones, and computers. Evidence, searched for, and recovered in these locations has included controlled substances, records pertaining to drug-related expenditures and profits, monetary instruments, and various assets that were purchased with the proceeds of the drug trafficking. I have participated in the execution of multiple federal search warrants.

5.      This affidavit is made in support of an application for a warrant to search a silver Apple MacBook Air laptop computer, bearing serial number FVFG5P5QQ6L4, as further described in Attachment A ("**Subject Computer**"), for evidence described further in Attachment B concerning narcotics offenses, in violation of Title 21, United States Code, Sections 841(a)(1) and 846 (the "**Subject Offenses**").

6.      In addition to the **Subject Computer**, on or about June 28, 2023, law enforcement officials seized a black Motorola Model XT2165DL cellular telephone, bearing IMEI number 351394590910909, as further described in Attachment A ("**Subject Phone**").

7.      The **Subject Computer** and the **Subject Phone** are currently in the custody of the Evanston Police Department as described below.

8.      The statements in this affidavit are based on my personal knowledge, and on information I have received from other law enforcement personnel and from persons with knowledge regarding relevant facts, and from my review of documents and evidence relevant to this investigation. Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact

2

known to me concerning this investigation. I have set forth facts that I believe are sufficient to establish probable cause to believe that evidence related to the **Subject Offenses** are located within the **Subject Computer** and the **Subject Phone**.

## I.   FACTS SUPPORTING PROBABLE CAUSE TO SEARCH THE SUBJECT COMPUTER

### A.   The Narcotics Transactions

9.   As explained below, on or about June 28, 2023, during the arrest of DARREN HUGHES, law enforcement recovered a cellular telephone—namely, a black Motorola Model XT2165DL cellular telephone, IMEI number 351394590910909, and assigned call number 669-XXX-0295 by Verizon Wireless, Inc. (the "**Subject Phone**") and a computer—namely, a silver Apple MacBook Air laptop computer, bearing serial number FVFG5P5QQ6L4 ("**Subject Computer**").

3

10.     On approximately five occasions between approximately May 4, 2023, and June 13, 2023, HUGHES[1] distributed a total of approximately 729 grams of methamphetamine and approximately 200 dosage units of fentanyl to a law enforcement official acting in an undercover capacity (the "UC"). To facilitate these distributions, HUGHES directed the UC to contact him through the Telegram[2] application, using a Telegram account (the "HUGHES Telegram Account 1") associated with telephone number 408-XXX-9653 (the "9653 Number").[3]  Based upon account

---

[1]     The identification of HUGHES, and HUGHES as the user of HUGHES Telegram Account 1, the **Subject Phone**, and the 9653 Number is based in part on the following: (1) the cellular phone display of HUGHES Telegram Account 1 identified the 9653 Number as a number associated with the Telegram account; (2) after the UC communicated with HUGHES Telegram Account 1 about purchasing narcotics, law enforcement positively identified HUGHES as the person who mailed the April 14, 2023 Parcel, the May 1, 2023 Parcel, and the May 20, 2023 Parcel to the UC based on a comparison of HUGHES's California driver's license photograph to surveillance footage obtained from the U.S. Postal Service; (3) HUGHES Telegram Account 1 sent the UC postal service tracking numbers of packages containing suspected narcotics, and law enforcement officials received those same packages at the UC Mailing Address; (4) on or about May 13, 2023, after the cellular provider terminated the account of the 9653 Number, HUGHES sent a text message to the UC through HUGHES Telegram Account 1 stating that he changed his phone number; (5) on or about May 13, 2023, HUGHES rented a hotel room in his name identifying the **Subject Phone** as his phone number; (6) a common toll analysis of the 9653 Number and the **Subject Phone** indicating that the phones were used by the same person, namely, HUGHES, and (7) on or about June 28, 2023, the Redwood City, California Police Department seized the **Subject Phone** from the front passenger seat of a vehicle driven by HUGHES.

[2]     Based on my training, experience, and information publicly available on Telegram.org I know that Telegram is an application-based communications system utilizing the internet to communicate with other Telegram users, which is accessible from any mobile telephone device or computer—but only through one mobile device at a time—including smartphones, such as iPhones and Android devices, tablets such as iPads, and desktop and laptop computers, including Macs and PCs. Telegram allows the sending of text messages, voice calls, video calls, voice message recordings, and multimedia messages through end-to-end encryption from any mobile telephone device or computer to another.

[3]     This investigation has included the use of consensually recorded conversations through Telegram Messenger. The summaries of the text messages are based on a review of those communications by law enforcement officials. The language that is quoted from the recorded

termination information for the 9653 Number, account activation information for **Subject Phone**, and toll analysis for the 9653 Number and **Subject Phone**, detailed below in paragraph 54 and 55, I believe that HUGHES transitioned from using the 9653 Number to using the **Subject Phone** in or around early to mid-May of 2023 and that HUGHES began to utilize the HUGHES Telegram Account 1 using the **Subject Phone** around this same time.

11. The April 2023, May 2023, and June 2023 distributions by HUGHES to the UC are summarized below.

| DATE MAILED | DATE RECEIVED | APPROXIMATE QUANTITY | SUSPECTED NARCOTIC | PRICE |
|---|---|---|---|---|
| April 6, 2023 | May 4, 2023 | 1 gram | Methamphetamine | Free Sample |
| April 14, 2023 | April 17, 2023 | 57 grams | Methamphetamine | $510 |
| May 1, 2023 | May 4, 2023 | 224 grams | Methamphetamine | $1,810 |
| May 16, 2023 and May 20, 2023 | May 19, 2023, and May 23, 2023 | 200 dosage units (total) | Fentanyl | $1,000 |
| June 10, 2023 | June 13, 2023 | 448 grams | Methamphetamine | $2,800 |

conversations throughout this Affidavit is based upon a preliminary review, not final transcripts or interpretations, of the recorded conversations. The times listed for the recorded conversations are approximate. The summaries do not include all potentially criminal communications or topics covered during the course of the recorded conversations. In certain instances, I will offer my interpretations of certain recorded conversations in brackets and otherwise. My understanding of these conversations is aided by the content and context of the conversations, my familiarity with the facts and circumstances of the investigation, my experience as a law enforcement agent, my discussions with other law enforcement officials in this investigation, and other evidence developed during the investigation.

### i. On or about April 6, 2023, HUGHES Mailed an Approximate 1.262 Gram Sample of Methamphetamine to the UC, Which Arrived in Chicago on or About May 4, 2023

12.     On or about April 6, 2023, while monitoring activity on the darknet[4] marketplace called Nemesis Market, law enforcement officials identified an online post on Nemesis Market advertising free samples of methamphetamine by a narcotics vendor operating under the moniker, "Provolonemacaroni." The post was titled "FREE SAMPLES High grade Meth," and the contents of the post stated "drop an addy [mailing address] is all you gotta do. My samples are 1g [gram]. USA to USA."

13.     On or about April 6, 2023, at approximately 3:13 p.m., the UC utilized Nemesis Market's online direct messaging system to contact the Provolonemacaroni account (the "Provolonemacaroni Store Account").[5] In the UC's message to the Provolonemacaroni Store Account, the UC asked, "Hey bro can I get that sample?" and provided the vendor an undercover mailing address located in Chicago, Illinois (the "UC Mailing Address").[6] An individual associated with Provolonemacaroni, and later

---

[4]     The "darknet" or "darkweb" is a portion of the internet that is not indexed or searchable by traditional online search engines, such as Google, and is designed to facilitate anonymous communication over the internet. Access to the darknet requires specific software or software configurations to access this unindexed portion of the internet.

[5]     A person must register an account on the Nemesis Marketplace to make product purchases or sales or communicate directly with a vendor.

[6]     The UC was located in the Northern District of Illinois while the UC communicated with HUGHES.

identified as HUGHES,[7] subsequently agreed to mail a methamphetamine sample to the UC in Chicago (the "Sample Methamphetamine Parcel").

14.     On or about April 9, 2023, at approximately 10:38 p.m., the UC received a message on Nemesis Market from the Provolonemacaroni Store Account.  The message read, "9505506621813096750745 usps.com." Based on my training, experience, and knowledge of the investigation, I believe that the message from the Provolonemacaroni Store Account identified the postal tracking number of the Sample Methamphetamine Parcel that was being shipped to the UC.

15.     According to U.S. Postal Service ("USPS") records, on or about April 6, 2023, the Sample Methamphetamine Parcel was mailed from the U.S. post office located at 1750 Lundy Avenue, in San Jose, California (the "Lundy Avenue Post Office").

16.     A USPS surveillance camera located inside the Lundy Ave Post Office's self-service kiosk captured a still-image of the individual who paid the postage for the

---

[7]     The identification of HUGHES as the user of the Provolonemacaroni Store Account is based in part on the following:  (1) surveillance footage from the Lundy Avenue Post Office dated on or about April 6, 2023 identified HUGHES as the person who mailed the Sample Methamphetamine Parcel discussed during the UC's communications with the Provolonemacaroni Store Account; (2) after the UC sent the Provolonemacaroni Store Account a message dated approximately April 13, 2023 seeking to purchase one or two ounces of methamphetamine, HUGHES contacted the UC through HUGHES Telegram Account 1 to discuss the purchase, and surveillance footage from the Eastridge Post Office dated on or about April 14, 2023 identified HUGHES as the person who mailed the April 14, 2023 Parcel to the UC; (3) on approximately May 13, 2023, after the UC sent a message to the Provolonemacaroni Store Account, HUGHES asked the UC to communicate through the "PacksStacks telegram," which was a reference to HUGHES Telegram Account 1; and (4) on or about May 10, 2023 and May 13, 2023, HUGHES rented hotel rooms at Hotel A and Hotel B, respectively, in his name and identified his e-mail address as provolonemacaroni@gmail.com.

Sample Methamphetamine Parcel. I have compared the images of the individual who mailed the Sample Methamphetamine Parcel to HUGHES's California driver's license photograph, and I believe HUGHES was the person who mailed the Sample Methamphetamine Parcel to the UC. More specifically, HUGHES's eye color, eye shape, nose, mouth, and facial hair resemble the appearance of the person depicted in the USPS surveillance image. Side-by-side images of the USPS surveillance image and HUGHES's California driver's license photograph appear below.

**April 6, 2023 USPS Surveillance Image**     **Driver's License Photo**

 

17.     On or about April 10, 2023, the USPS marked the Sample Methamphetamine Parcel "return to sender" because the mailing address on the label of the Sample Methamphetamine Parcel did not contain the mailbox number for the UC Mailing Address.

18.     On or about April 10, 2023, the USPS marked the Sample Methamphetamine Parcel "return to sender" because the mailing address on the label

8

of the Sample Methamphetamine Parcel did not contain the mailbox number for the UC Mailing Address.[8]

19.     At the request of the DEA, after the Sample Methamphetamine Parcel failed to arrive in the mail, the U.S. Postal Inspection Service ("USPIS") retrieved the Sample Methamphetamine Parcel in San Jose, California and delivered it to the DEA in Chicago, on or about May 4, 2023.

20.     DEA found the package to contain a clear plastic bag that contained approximately one gram of a white crystalline substance of suspect methamphetamine. According to the DEA laboratory, the substance that HUGHES mailed to the UC weighed a total of approximately 1.275 grams and tested positive for pure (actual) methamphetamine in the amount of approximately 1.262 grams.

>    ii.     **On or about April 14, 2023, HUGHES Mailed Approximately 56.4 grams of Methamphetamine to the UC, Which Arrived in Chicago on or About April 17, 2023**

21.     On or about April 13, 2023, the UC sent a message to the Provolonemacaroni Store Account on the Nemesis Market requesting that Provolonemacaroni contact the UC through the Telegram or Signal messaging applications to set up a one-to-two-ounce methamphetamine purchase. The UC's message read, "yo i'm lookin to grab an oz [ounce] or 2 [of methamphetamine]. hmu [hit me up] if you want to set it up (via telegram/signal)."

---

[8]     The substance was not field-tested. The Sample Methamphetamine Parcel had a sender name and address of "M Bustos, 2002 Fruitdale, San Jose, California" and a recipient address listing the UC's Mailing Address.

22.     That same evening, at approximately 6:15 p.m., HUGHES, using the HUGHES Telegram Account 1, which used the display name "Pacls Stacks" and was associated with the 9653 Number, sent the UC a photograph depicting the UC's communications with the Provolonemacaroni Store Account from earlier that day discussing the UC's desire to buy one or two ounces of methamphetamine. As depicted below, the photograph depicts a screenshot taken from a MacBook Air computer. The message depicted in the photograph at the bottom of the screen is the UC's message to the Provolonemacaroni Store Account described in paragraph 21 above that read, "yo i'm lookin to grab an oz [ounce] or 2 [of methamphetamine]. hmu."[9]

**<u>April 13, 2023 Image from HUGHES Telegram Account 1</u>**



---

[9]     Law enforcement officials brightened the image to better observe the MacBook Air logo on the computer.

10

23.     At approximately 6:30 p.m., HUGHES, using the HUGHES Telegram Account 1 associated with the 9653 Number, sent the UC a photograph of a white crystalline substance of suspected methamphetamine sitting on top of a digital scale. According to the depiction of the scale in the photograph, the substance weighed approximately 75.46 grams.

24.     That same day, the UC communicated with HUGHES via HUGHES Telegram Account 1 and ordered two ounces of methamphetamine from HUGHES for $510 (approximately .01657135 bitcoin).

25.     On or about April 14, 2023, at approximately 4:58 p.m., HUGHES, using the HUGHES Telegram Account 1 associated with the 9653 Number, sent the UC a photograph of a mail parcel of a priority mail package addressed to the UC Mailing Address.  The label depicted in the photograph contained U.S. PS tracking number 9570 1066 2366 3104 4526 42 (the "April 14, 2023 Parcel").[10]

26.     According to the U.S. Postal Service's records, on or about April 14, 2023, the April 14, 2023 Parcel was shipped from the U.S. Post Office located inside the Eastridge Shopping Mall at 2200 Eastridge Loop, in San Jose, California (the "Eastridge Post Office") to the UC Mailing Address. A USPS surveillance camera located inside the Eastridge Post Office's self-service kiosk captured a still-image of the individual who paid the postage for the April 14, 2023 Parcel. Based on a comparison of

---

[10]     As depicted in the photograph, the April 14, 2023 Parcel contained a sender name and address of "M B, 2001 Fruitdale Ave., San Jose, California." The April 14, 2023 Parcel's mailing address contained the UC's street address but not the mailbox number.

the April 14, 2023, surveillance image to HUGHES's California driver's license photograph, I believe that HUGHES was the person who mailed the April 14, 2023 Parcel to the UC.

27.     On or about April 17, 2023, the April 14, 2023 Parcel arrived at the UC Mailing Address. The April 14, 2023, Parcel contained a white crystalline substance. According to the DEA laboratory, the substance that HUGHES mailed to the UC weighed a total of approximately 57 grams and tested positive for methamphetamine (actual) in the amount of approximately 56.4 grams.

### ii.     On or about May 1, 2023, HUGHES Mailed Approximately 224 Grams of Suspected Methamphetamine to the UC, Which Arrived in Chicago on or About May 4, 2023

28.     On or about April 23, 2023, at approximately 8:50 p.m., HUGHES, using the HUGHES Telegram Account 1, exchanged the following text messages with the UC about a narcotics transaction:

| | |
|---|---|
| UC: | Yo how much that hp [half pound of methamphetamine] |
| HUGHES: | 1800 [dollars] |
| UC: | Shit what a full one [pound] go for? 18 [$1,800] seem $$ [expensive] |
| HUGHES: | Ill do 2800 [dollars] for you on a full [pound of methamphetamine]. You not gon find better price or quality |

29.     Based on my training, experience, and knowledge of the investigation, I believe that during the above-exchange, HUGHES agreed to sell the UC a half-pound

of methamphetamine for $1,800 and quoted the UC a price of $2,800 for a full pound of methamphetamine.

30.     On or about April 30, 2023, from approximately 6:45 p.m. to 7:33 p.m., HUGHES, using the HUGHES Telegram Account 1, exchanged the following text messages with the UC:

| APPROXIMATE TIME | SPEAKER | CONVERSATION |
|---|---|---|
| 6:45 p.m. | UC | Ite bro you still good for this hp [half pound of methamphetamine]? |
| 7:20 p.m. | HUGHES | Of course. Always ready |
| 7:23 p.m. | UC | Thats what I like to hear. Shoot me the [bitcoin] wallet |
| 7:24 p.m. | HUGHES | bc1qv9dxcuay0yzdvymc33tzujnuhdv8jm565zqdcj |
| 7:30 p.m. | UC | $1810 .06174469 BTC bout to hit go |
| 7:33 p.m. | HUGHES | Yesirr I got u |

31.     Based on my training, experience, and knowledge of the investigation, I believe that during the above exchange: (1) the UC confirmed that HUGHES was still ready and willing to sell a half pound of methamphetamine; (2) HUGHES sent the UC the address of HUGHES's bitcoin wallet for payment for the narcotics; and (3) the UC confirmed that the UC will send $1,810 to HUGHES (approximately 0.06174469 bitcoin) to purchase one half-pound of methamphetamine, including, $10 for shipping.

32.     On or about May 1, 2023 at approximately 8:18 p.m., HUGHES, using the HUGHES Telegram Account 1, sent a photograph to the UC that depicted a USPS

Priority envelope with postage dated May 1, 2023, and bearing tracking number 9505 5065 8241 3121 7701 79 (the "May 1, 2023 Parcel").[11]

33.    According to USPS records, on or about May 1, 2023, the May 1, 2023 Parcel was mailed from the post office located at 850 Front Street in Santa Cruz, California (the "Front Steet Post Office") to the UC Mailing Address. A USPS surveillance camera located inside the Front Steet Post Office's self-service kiosk captured a still-image of HUGHES paying the postage for the May 1, 2023 Parcel. Shortly after the HUGHES started to complete the transaction, HUGHES covered the kiosk's camera with a receipt. Based on my comparison of the May 1, 2023 surveillance image to HUGHES's California driver's license photograph, I believe that HUGHES was the person who mailed the May 1, 2023 Parcel to the UC.

34.    On or about May 4, 2023, the May 1, 2023 Parcel arrived at the UC Mailing Address.  According to the DEA laboratory, the substance that HUGHES mailed to the UC weighed a total of approximately 226 grams and tested positive for pure (actual) methamphetamine in the amount of approximately 223.7 grams.

35.    The previous day, on or about May 3, 2023, from between approximately 10:40 a.m. and 3:59 p.m., HUGHES, using the HUGHES Telegram Account 1, exchanged the following text messages with the UC:

   HUGHES:   TD [touch down]?

---

[11]    The May 1, 2023 Parcel contained a sender address of "M B, 2002 Fruitdale, San Jose, California" and a mailing address that listed the UC's street address but not the UC's mailbox number.

| | | |
|---|---|---|
| UC: | It ain't land yet [the package was not delivered yet] homie. | |
| HUGHES: | What??? Says delivered Says picked up by Individual And bro if it's a po box u posed [supposed] to just put po box not the address of the post | |

36. At approximately 4:00 p.m., HUGHES, using the HUGHES Telegram Account 1, sent the UC a screen shot of the USPS tracking information for the May 1, 2023 Parcel, writing, "Hell naw. Shit there." The UC did not respond to the message.

37. At approximately 4:08 p.m., the UC received a phone call from the 9653 Number. The UC did not answer the call, and the caller did not leave a voice mail message.

38. From approximately 4:27 p.m. to 4:33 p.m., HUGHES, using the HUGHES Telegram Account 1 associated with the 9653 Number, exchanged the following text messages with the UC:

| APPROXIMATE TIME | SPEAKER | CONVERSATION |
|---|---|---|
| 4:27 p.m. | UC | Bro it's not in my box same shit happened with that other pack you sent I still got it. Mail in chi [Chicago] slow as shit. I just grabbed m30s [oxycodone] from my shit [mailbox] today. I'm not sweating it [worried] yet. |
| 4:29 p.m. | HUGHES | So u think it will be there? Cause its wierd says somebody has it. |
| 4:31 p.m. | UC | I get shit posted delivered and it lands a day later all the time. If I ain't get it tom [tomorrow] then I worry. Might take an extra day without the box # told you bro I aint sweating it Never |

15

| | | |
|---|---|---|
| | | lost a pack [package] |
| 4:33 p.m. | HUGHES | And i got better m30s [oxycodone] then what u gettin. Real talk all the smokers say these better. They burn gold in the foil and melt. U needa fw [fuck with] me on those. |

39.     At approximately 4:33 p.m., HUGHES, using the HUGHES Telegram Account 1 associated with the 9653 Number, sent the UC a photograph of a bag on the floor of a room containing what appeared to be thousands of blue-colored circular pills. The photo is depicted below:

**<u>Photograph from HUGHES Telegram Account 1</u>**



40.     Based on my training, experience, and knowledge of the investigation, I believe that: (1) the UC told HUGHES that the UC had not yet received the May 1, 2023 Parcel, and told HUGHES not to be concerned because Chicago mail is slow and the UC just picked up m30s, a reference to oxycodone, from the UC Mailing Address; (2) HUGHES told the UC that he has a higher quality of m30s, meaning oxycodone,

16

available for sale, and they "burn gold in the foil and melt," an indication that the pills can be smoked; and (3) HUGHES sent the UC a photograph depicting blue-colored pills that resemble the appearance of m30 pills.[12]

41. At approximately 5:21 p.m., HUGHES, using the HUGHES Telegram Account 1, exchanged the following text messages with the UC:

| UC: | Wtw [what's the word] on the m30s |
|---|---|
| HUGHES: | My people got em by the boat [packages of 1000 pills] ww fw the mexicans in az [Arizona] so they really from over the border 1000x @ $4500 Super high quality |

42. Based on my training, experience, and knowledge of the investigation, I believe that: (1) HUGHES stated that he has a supply of m30 pills and sells them by the "boat," meaning quantities of 1,000 pills, for a price of $4,500; and (2) HUGHES also stated that the pills were of high quality and come from Mexico, which based on my training and experience, is a major source of counterfeit pharmaceuticals that often containing fentanyl.

### iii. In Early to Mid-May of 2023, HUGHES Transitioned from the 9653 Number to the Subject Phone

43. On or about May 10, 2023, U.S. Magistrate Judge Susan van Keulen in the United States District Court for the Northern District of California issued a warrant authorizing Metro PCS Communications Inc. ("Metro PCS") to produce

---

[12] Based on my training and experience, the large quantity of pills and the nature of the packaging depicted in the photograph indicate that the pills may be counterfeit pharmaceuticals that contain a different controlled substance. Furthermore, a person who

17

prospective location information for the 9653 Number to law enforcement officials for a period of 30 days. Case No. CR-23-70647 (N.D. Cal.). On or about May 11, 2023, at approximately 11:30 a.m., law enforcement began receiving prospective location information for the 9653 Number.[13]

44.     According to records from Metro PCS, on or about May 11, 2023, from approximately 11:30 a.m. until approximately 2:00 p.m., the 9653 Number was located in the vicinity of Hotel A located at 2900 block of Mission Street, in Santa Cruz, California.[14]

45.     According to records from Hotel A, HUGHES rented a hotel room in his name at Hotel A for the night of May 10, 2023. HUGHES provided Hotel A with e-mail address "provolonemacaroni@gmail.com" and identified his home address on the 1300 block of Ridgecrest Road in Pinole, California (the "HUGHES Residence").  The California Secretary of State likewise identifies the HUGHES Residence as HUGHES's address.[15]

---

markets large quantities of pharmaceutical pills may actually be selling a counterfeit pill of another controlled substance that is less costly to procure and produce, such as fentanyl.

[13]     According to records from Metro PCS, on or about May 11, 2023, the provider terminated the account of the 9563 Number due to nonpayment. Law enforcement officials, however, continued to receive location data for the 9563 Number intermittently until approximately May 16, 2023.

[14]     According to Metro PCS's records, the identified location of the had a range of approximately 245 meters. The Fairfield Inn is located within the 245-meter range.

[15]     According to records from Hotel A, HUGHES identified his telephone number as 707-XXX-7440 (the "7440 Number").  According to a law enforcement database, the number ending in 7440 is a VoIP (Voice over Internet Protocol) number associated with the provider Bandwidth.com. Based on my training and experience, I know that a VoIP number operates over an internet connection and is a method that may be used by individuals involved in

46.     On or about May 12, 2023, at approximately 11:22 p.m., the UC utilized Nemesis Market's online direct messaging system to contact the Provolonemacaroni Store Account. In the UC's message, the UC wrote, as a ruse, "ay bro i hit u up u aint respond wtw [what's the word]?" On or about May 13, 2023, at approximately 2:45 a.m., HUGHES responded, "no u did not @PacksStacks[16] telegram." The UC did not respond to this message.

47.     Based on my training, experience, and knowledge of the investigation, I believe that during the above exchange, the UC asked HUGHES, as a ruse, why HUGHES did not respond to a request to purchase additional narcotics, and HUGHES responded that the UC should communicate with HUGHES through HUGHES Telegram Account 1.

48.     On or about May 13, 2023, from approximately 9:57 a.m. to 10:21 a.m., HUGHES, using HUGHES Telegram Account 1,[17] exchanged the following text messages with the UC:

| APPROXIMATE TIME | SPEAKER | CONVERSATION |
|---|---|---|
| 9:57 a.m. | HUGHES | This bro from the market? |
| 10:05 p.m. | UC | Yea we been talkin weeks on this [Telegram] you ain't have our old shit |

criminal activity to obfuscate the identity of their true wireless telephone providers. In addition, a VoIP phone number may be utilized on more than one phone or electronic device such as a computer.

[16]     As described above, the HUGHES Telegram Account 1 used the display name "Pacls Stacks."

[17] Unless otherwise stated, the Telegram messages from HUGHES did not identify the specific telephone number (i.e., the call number of the 9653 Number or the **Subject Phone**) that HUGHES used to send messages from HUGHES Telegram Account 1.

| | | [messages]? This the same dude or what |
|---|---|---|
| 10:17 a.m. | HUGHES | Nah I got a new phone<br>My bad<br>Yeah it's same dude I got your message on nemesis |
| 10:21 a.m. | HUGHES | Damn near had to make a new acct cause iI a diff number...I got two telegrams<br>[Screenshot attached showing two Telegram profiles, including the now suspended 9563 Number] |

49.　The screenshot that HUGHES sent the UC from HUGHES Telegram Account 1 identified two Telegram user names: "Packs" and "Pacls Stacks."

50.　Based on my training, experience, and knowledge of the investigation, I believe that during the above-exchanges: (1) HUGHES identified himself as "this bro from the market," meaning the person who previously sold narcotics to the UC through darknet vendor Provolonemacaroni; (2) the UC asked whether the UC was still communicating with the same person by asking if HUGHES had their previous communications; (3) HUGHES stated that he had lost the previous communications due to obtaining a new phone and phone number; and (4) HUGHES stated that he created a new Telegram account and provided the UC with a screenshot showing that HUGHES had two Telegram accounts, one account under username "Pacls Stacks" ("HUGHES Telegram Account 1") and one account under username "Packs" ("HUGHES Telegram Account 2").

51.　On or about May 14, 2023, at approximately 7:52 a.m., HUGHES sent the UC a photograph from HUGHES Telegram Account 1. As depicted below, the photograph contained round, blue-colored, circular pills, stamped with "M30", which

were sitting on top of a desk. The hotel room desk contained "Hotel B" branded items, including a notepad and a customer suggestion form. The accompanying text message stated "142 x $5 = 710 better grab em while I got em on me." The UC did not respond to the message.

**Photograph from HUGHES Telegram Account 1**



52.     Based on my training, experience, and knowledge of the investigation, I believe that in the above-message, HUGHES advertised the sale of approximately 142 m30 pills [suspect counterfeit oxycodone] for $5 per pill or a total purchase price of $710.

53.     According to the Hotel B's records, on or about May 13, 2023, HUGHES rented a hotel room at Hotel B in San Jose, California. HUGHES rented the hotel room in his name and provided Hotel B with an e-mail address of "provolonemacaroni@gmail.com." HUGHES also identified his home address as the HUGHES Residence and his phone number as the call number of the **Subject Phone**.

21

54.     According to records from Verizon Communications Inc., the account for the **Subject Phone** was activated on or about May 7, 2023, approximately four days before Metro PCS's termination of the account for the 9653 Number for lack of payment.[18]

55.     Toll records for the 9653 Number and the **Subject Phone** (collectively, the "HUGHES Phones") from approximately March 21, 2023, through June 29, 2023 reflect that they shared 18 common contacts.  Over that approximate time period, common contacts for the HUGHES Phones included: (1) for a phone number ending in 9202, 67 contacts with the 9653 Number and 18 contacts with the **Subject Phone**; (2) for a phone number ending in 5848, 177 contacts with the 9653 Number and 185 contacts with the **Subject Phone**; (3) for a number ending in 9059, 181 contacts with 9653 Number and 125 contacts with the **Subject Phone**.  Based on my training, experience, and knowledge of the investigation, I believe that, based on the common contacts and additional information associating HUGHES with the HUGHES Phones as described above, the HUGHES Phones, including the **Subject Phone**, were used by HUGHES.

---

[18]     The subscriber of the **Subject Phone** is identified as "Tracfone" with an address of "09700 NW 12 Ave, Miami Florida," which resembles the corporate address of Tracfone Wireless, Inc.  Tracfone Wireless, Inc. identifies its address as 9700 N.W. 112th Avenue, Miami, FL 33178.  https://www.tracfone.com/support/contact-us (last visited July 20, 2023).

     **iv.**     **On or about May 16 and 20, 2023, HUGHES Mailed Packages that Contain Approximately 15.57 grams of Fentanyl and Suspect Fentanyl to the UC, Which Arrived in Chicago on or About May 19 and 23, 2023**

56. On or about May 16, 2023, from approximately 12:35 p.m. to 12:41 p.m., HUGHES, using HUGHES Telegram Account 1, exchanged text messages with the UC. In those messages, HUGHES agreed to sell 200 m30 pills to the UC for $1,000 (approximately 0.03512875 bitcoin). HUGHES stated, "Ok so for $1k u get 200. Just trust me on the quality they more than likely better than what u getting."

57. Based on my training, experience, and knowledge of the investigation, I believe that, in the above communication, HUGHES stated that for the purchase price of $1,000, he could sell to the UC 200 m30 pills of high quality.

58. On or about May 16, 2023, at approximately 8:46 p.m., HUGHES, using HUGHES Telegram Account 1, sent the UC a photograph of a postal receipt containing tracking number 9505 5136 4833 3136 0536 50 (the "May 16, 2023 Parcel").[19] HUGHES' message accompanying the USPS tracking number read, "It's the 142 [M30 pills] I had before. I went n got em...that's all we got on us ATM [at the moment]....some one else in AZ [Arizona] Is gonna send u the other 58 [m30 pills] tommorrow. There is boats [thousands] of these on the way we just kinda dry ATM. I'll hit u wit the other tracking tomorrow."

---

[19] The May 16, 2023 Parcel contained a sender address of "M B, 1919 Fruitdale, S J, CA 95128" and a mailing address that listed the UC's street address but not the UC's individual mailbox number.

59.     Based on my training, experience, and knowledge of the investigation, I believe that in the above-exchange: (1) HUGHES stated that he shipped 142 m30 pills to the UC; (2) the remaining portion of the UC's order (58 pills) would be shipped from an individual in Arizona; and (3) HUGHES expects to receive a shipment of thousands of m30 pills ("boats") in the near future.

60.     According to USPS records, on or about May 16, 2023, HUGHES mailed narcotics (the "May 16, 2023 Parcel") from San Jose, California to the UC Mailing Address.[20] According to USPS records, HUGHES paid the postage for the May 16, 2023 Parcel in cash at the customer service counter and did not use a self-service kiosk.

61.     On or about May 19, 2023, the May 16, 2023 Parcel arrived at the UC Mailing Address.

62.     The May 16, 2023 Parcel contained round blue-colored circular pills stamped "m30." According to the DEA laboratory, the pills that HUGHES distributed to the UC in the May 16, 2023 Parcel weighed a total of approximately 15.57 grams and tested positive for the presence of fentanyl.

63.     On or about May 19, 2023, at approximately 10:24 p.m., HUGHES, using HUGHES Telegram Account 1, sent the UC a photograph of two knotted plastic bags, each containing multiple, blue-colored, circular pills stamped "m30." The accompanying message stated, "Got em. It's two diff kinds. I'll drop [mail] it tommorow."

---

[20]     Law enforcement requested additional records and surveillance footage from the U.S. Postal Service for the May 16, 2020 Parcel and the May 20, 2023 Parcel and is waiting for the results.

64.     Based on my training, experience, and knowledge of the investigation, I believe that, in the above-message, HUGHES told the UC that he had two different mixtures or variants of m30 pills and would send them in the mail the following day.

65.     On or about May 20, 2023, at approximately 8:37 p.m., HUGHES, using HUGHES Telegram Account 1, sent the UC a photograph that depicted a USPS Priority Mail envelope with postage dated May 20, 2023, and bearing tracking number 9505 5066 2201 3140 7108 27 (the "May 20, 2023 Parcel").[21]

66.     According to USPS records, on or about May 20, 2023, HUGHES sent the May 20, 2023 Parcel from the Lundy Avenue Post Office, in San Jose, California, to the UC Mailing Address.  A USPS surveillance camera located inside the Lundy Ave Post Office's self-service kiosk captured a still-image of HUGHES as he paid for the postage for the May 20, 2023 Parcel. Based on my comparison of the May 20, 2023, surveillance image to HUGHES's California driver's license photograph, I believe that HUGHES was the person who mailed the May 20, 2023 Parcel to the UC.

67.     On or about May 23, 2023, the May 20, 2023 Parcel arrived at the UC Mailing Address.  The May 20, 2023 Parcel contained round, blue, circular pills that were each stamped with the marking "m30."  The DEA did not field test the substance, which had a gross weight, including packaging, of approximately 40.2 grams.  The DEA sent the substance to the DEA laboratory for testing and analysis, and those laboratory results are pending.

---

[21]     The May 20, 2023 Parcel contained a sender address of "M B, 2001 Fruitdale Ave, San Jose, CA 95128" and a receiving address that listed the UC Mailing Address.

25

> v. **On or about June 10, 2023, HUGHES Mailed Approximately 448 Grams of Methamphetamine to the UC, Which Arrived in Chicago on or About June 13, 2023**

68.     On or about June 9, 2023, from approximately 1:48 p.m. to 2:09 p.m., HUGHES, using HUGHES Telegram Account 1, exchanged the following text messages with the UC:

| APPROXIMATE TIME | SPEAKER | CONVERSATION |
|---|---|---|
| 1:48 p.m. | UC | You ready with that whole one [pound of methamphetamine]? |
| 1:50 p.m. | HUGHES | Definitely<br>Just bust dwn a whole one I'm about ready to re up myself |
| 1:54 p.m. | UC | Shoot me the addy [bitcoin address] |
| 1:55 p.m. | HUGHES | bc1qa07fgrq39alp3allvj0gz2287j89vhxpuq924n |
| 2:02 p.m. | UC | 2800 [dollars]? |
| 2:02 p.m. | HUGHES | Yesirr |
| 2:07 p.m. | UC | Just hit go |
| 2:08 p.m. | HUGHES | Ok I'll be in motion |
| 2:09 p.m. | HUGHES | It will land [be delivered] Monday weather I drop [ship] it today or tomorrow . I'll hit u with the label when I do. Appreciate your business. |

69.     Based on my training, experience, and knowledge of the investigation, I believe that in the above-exchange: (1) the UC asked whether HUGHES was ready to complete a transaction for one pound of methamphetamine and HUGHES replied affirmatively; (2) HUGHES stated that he had just finished distributing a pound of methamphetamine ("just bust dwn a whole one") and needed to replenish ("re up") his supply; (3) HUGHES sent the UC an address of a digital wallet to pay for the narcotics; (4) the UC confirmed that the purchase price of one pound of methamphetamine was $2,800 (approximately 0.10593962 bitcoin) and that the UC sent the payment to the

bitcoin wallet HUGHES identified; and (5) HUGHES stated that he will ship the narcotics for an estimated delivery date of Monday, June 12, 2023.

70.     On or about June 10, 2023, at approximately 6:54 p.m., HUGHES, using HUGHES Telegram Account 1, sent a photograph to the UC that depicted a USPS Priority envelope with postage dated June 10, 2023, and bearing tracking number 9505 5065 6371 3161 6240 56 (the "June 10, 2023 Parcel").[22]

71.     According to USPS records, on or about June 10, 2023, the June 10, 2023 Parcel was mailed from the post office located at 37010 Dusterberry Way in Fremont, California (the "Fremont Post Office") to the UC Mailing Address. The USPS surveillance video camera, located within the Fremont Post Office self-service kiosk that HUGHES used to mail the June 10, 2023 Parcel, was obstructed during the timeframe of the transaction, and the surveillance camera did not record any images of HUGHES.[23]

72.     On or about June 12, 2023, at approximately 10:00 p.m., HUGHES, using HUGHES Telegram Account 1, sent the UC a message that read, "Says delivered." On or about June 13, 2023, at approximately 11:08 a.m., the UC responded, "They [postal] always on bs it land [was delivered] today tho."

---

[22]     The June 10, 2023 Parcel contained a sender address of "M B, 920 Larkin St, Salinas, CA 93907-2508" and a receiving address that listed the UC Mailing Address.

[23]     During the transaction for the June 10, 2023 Parcel, the camera appeared to be obstructed by a piece of paper. The camera functioned properly during the transactions immediately preceding and following the purchase of postage for the June 10, 2023 Parcel, leading law enforcement to believe that HUGHES obstructed the camera.

73. Based on my training, experience, and knowledge of the investigation, I believe that in the above-exchange, HUGHES told the UC that, according to the USPS records, the June 10, 2023 Parcel was delivered to the UC on or about June 12, 2023, and the UC responded that the UC received the parcel on June 13, 2023.

74. On or about June 13, 2023, the June 10, 2023 Parcel arrived at the UC Mailing Address. According to the DEA laboratory, the substance that HUGHES mailed to the UC weighed a total of approximately 444.2 grams and tested positive for methamphetamine (actual) in the amount of approximately 328.7 grams.

75. On or about June 12, 2023, Magistrate Judge Virginia K. DeMarchi authorized a warrant in the United States District Court of the Northern District of California to obtain prospective location data for the **Subject Phone** for a time period of 30 days. Case No. 23-70850-VJD (N.D. Cal.). On or about June 14, 2023, enforcement officials began receiving location data for the **Subject Phone**.

**B.** **On or about June 26, 2023, HUGHES Advertised the Sale of Cocaine**

76. On or about June 26, 2023, at approximately 8:17 p.m., HUGHES, using HUGHES Telegram Account 1, sent the UC a message that read, "Got grade AAA fishscale [cocaine] too did I mention [nose emoji and a snowflake emoji]." Approximately one minute later, HUGHES, using HUGHES Telegram Account 1, sent the UC two photographs. The first photograph depicted a white powdery substance of suspect cocaine sitting on top of a digital scale depicting a weight of 14.1 grams. The second photograph contained multiple clear and green-colored baggies each of which

28

contained a white powdery substance of suspect cocaine laying on top of a USPS priority mail envelope. The two photographs appear below:

**June 26, 2023 Photographs from HUGHES Telegram Account 1**



77.     Based on my training, experience, and knowledge of this investigation, I believe that during the above-exchange, HUGHES told the UC that HUGHES had a supply of "fishscale," meaning high quality cocaine.

**C.      On or about June 27, 2023, HUGHES Agreed to Distribute One Pound of Methamphetamine to UC2**

78.     On or about June 27, 2023, from approximately 5:35 p.m. to 5:47 p.m., HUGHES, using HUGHES Telegram Account 1, exchanged the following text messages with a person who, unbeknownst to HUGHES, was a second undercover officer ("UC2") using the same Telegram account as the UC:[24]

---

[24]     During UC2's communications with HUGHES, UC2 was located in the Northern District of California.

29

| APPROXIMATE TIME | SPEAKER | CONVERSATION |
|---|---|---|
| 5:35 p.m. | UC2 | What I really need is a whole one. [pound of methamphetamine] |
| 5:36 p.m. | HUGHES | Yeah that's easy [yawn emoji]. But let's do it if that's all u wnt |
| 5: 42 p.m. | UC2 | Thst shit moves. Im collecting the last bit of changes now. If i hit u tomorrow in the AM can you get that out tomorrow? Need that bad for the weekend |
| 5:43 p.m. | HUGHES | U mean the [ice cube emoji] right? Easy |
| 5:43 p.m. | UC2 | Yeah |
| 5:43 p.m. | HUGHES | Shoot me the btc [bitcoin] early n it's done |
| 5:43 p.m. | UC2 | bet [ok] |
| 5:44 p.m. | HUGHES | Shit homie but two Jesus. Two [pounds] for 5k [$5000] flat. One [pound] is 28 [$2800] |
| 5:45 p.m. | UC2 | need 1 [one pound] for now. That 5k on the next. i can fuck with that im gonna hit u first thing in the AM to get that addy [bitcoin wallet addess] |
| 5:47 p.m. | HUGHES | [Thumbs up emoji] |

79. Based on my training, experience, and knowledge of the investigation, I believe that during the above-exchange: (1) UC2 asked HUGHES to sell the UC2 one pound of methamphetamine; (2) HUGHES responded, "that's easy," meaning that HUGHES could fill UC2's narcotics order; (3) UC2 told HUGHES that UC2 was collecting the money to complete the transaction and asked to make the purchase the following morning (June 28, 2023); (3) HUGHES texted UC2 an emoji of an ice cube to

confirm that UC2 wished to purchase methamphetamine; and (4) UC2 responded, "yeah," confirming that UC2 requested methamphetamine and would pay HUGHES in bitcoin the following morning.

### D. HUGHES's June 28, 2023 Arrest and Seizure of the Subject Phone and the Subject Computer

80.     On or about June 23, 2023, Magistrate Judge Jeffrey Cole authorized a criminal complaint charging HUGHES with distributing 50 grams or more of methamphetamine (actual) on or about April 17, 2023, in violation of Title 21, United States Code, Section 841(a)(1). *United States v. Darren Hughes*, 23 CR 368 (N.D. Ill.); Dkt 1. That same day, Judge Cole issued a warrant for HUGHES's arrest (the "Arrest Warrant").

81.     On or about June 28, 2023, at approximately 8:43 a.m., law enforcement officials conducting physical surveillance observed HUGHES[25] inside a parking lot located in the 4500 block of Warm Springs Boulevard in Fremont, California. HUGHES was seated in the driver's seat of a parked Mercedes sedan with California registration 8BGM738 (the "HUGHES Vehicle").[26]

82.     On or about June 28, 2023, from approximately 10:13 a.m. to 11:20 a.m., HUGHES, using HUGHES Telegram Account 1, exchanged the following text messages with UC2:

---

[25]     Law enforcement officials identified HUGHES through his California driver's license photograph.

[26]     The HUGHES Vehicle is registered to Individual A on the 1300 block of 1367 Ridgecrest Road in Pinole, California 94564.

| APPROXIMATE TIME | SPEAKER | CONVERSATION |
|---|---|---|
| 10:13 a.m. | HUGHES | Wtw [what's the word] my g |
| 11:01 a.m. | UC2 | send me the addy [bitcoin wallet addess] I got that |
| 11:09 a.m. | HUGHES | Ok bc1qcqfg9edf0elg3ztxmh0n7sn xpgey9l9vkj2g3v [bitcoin wallet address] |
| 11:13 a.m. | UC2 | sent. fuck with me today. need that please. i got some cust [customers] that want that snow white [cocaine]. whats the price on that? |
| 11:15 a.m. | HUGHES | 1300 [$1300] a zip [ounce]. A ¼ brick [a quarter kilo of cocaine] is $8k. Shits fishscale u can cook it up too if needed. Gon come all the way back. |
| 11:17 a.m. | UC2 | nice. gonna put something together for a zip [ounce of cocaine] to try. shit looked fire on the pic |
| 11:18 a.m. | HUGHES | It is. Definitely |
| 11:19 a.m. | UC2 | did the btc [bitcoin] land |
| 11:20 a.m. | HUGHES | Not yet. Takes a min [minute] Yup just landed |

83.     Based on my training, experience, and knowledge of the investigation, I believe that in the above-exchange: (1) HUGHES asked whether UC2 was ready to purchase one pound of methamphetamine;[27] (2) UC2 asked HUGHES for a bitcoin wallet address to make payment, and HUGHES identified the bitcoin wallet address;

---

[27]     As discussed in paragraph 78 above, HUGHES quoted a price of $2,800 for one pound of methamphetamine.

(3) UC2 confirmed sending the bitcoin payment and requested that HUGHES mail the methamphetamine the same day (June 28, 2023); (4) HUGHES quoted UC2 a price of $1,300 an ounce ("zip") for the "snow white" (cocaine); (5) UC2 stated that the cocaine looked like "fire," meaning high quality, in the photograph, and HUGHES responded, "It is. Definitely"; and (6) HUGHES confirmed receipt of the bitcoin payment sent by UC2.

84. On or about June 28, 2023, commencing at approximately 11:24 a.m., law enforcement officials conducting physical surveillance of HUGHES observed the following:

a. At approximately 11:24 a.m., HUGHES drove the HUGHES Vehicle to a bank located on the 4600 block of Mission Boulevard in Fremont, California and used an ATM on the exterior of the building.

b. At approximately 12:01 p.m., HUGHES drove the HUGHES Vehicle to the Southland Mall located at One Southland Mall Drive in Hayward, California. At approximately 12:08 p.m., HUGHES stood in front of a bitcoin ATM machine located inside the mall. Based on the ATM's location and physical appearance, HUGHES appeared to use a NovaBTM bitcoin ATM machine.[28]

c. At approximately 12:14 p.m., HUGHES left the bitcoin ATM machine and returned to the HUGHES Vehicle.

---

[28] NovaBTM is a company that operates bitcoin machines at various locations, including the Bay Area. https://www.novabtm.com/home (last viewed July 20, 2023). A photograph of the bitcoin ATM machine and description of its location inside the Southland Mall is posted on NovaBTM's website. https://www.novabtm.com/southland (last viewed July 20, 2023).

d. At approximately 12:49 p.m., HUGHES exited the HUGHES Vehicle and returned to the same bitcoin ATM inside the Southland Mall. HUGHES left the bitcoin ATM at approximately 12:57 p.m. and departed from the Southland Mall.

e. At approximately 2:10 p.m., HUGHES drove to a parking garage at the Westfield Valley Mall located on the 2800 block of Stevens Creek Boulevard in Santa Clara, California. Between approximately 2:35 p.m. and 2:40 p.m., HUGHES exited and then reentered the mall.

85. According to Verizon's records, on or about June 28, 2023, at approximately 11:19 a.m. and 11:23 a.m., the **Subject Phone** called 844-668-2286 (the "2286 Customer Service Number"), the telephone number of NovaBTM.[29] According to NovaBTM's website, a person may utilize a telephone to buy or sell bitcoin through the use of an SMS verification code or may pre-deposit a cash withdrawal by calling the 2286 Customer Service Number.[30]

86. According to NovaBTM's records, HUGHES was a NovaBTM customer commencing approximately February 21, 2023. HUGHES had a customer profile in his name, and HUGHES identified his address as the HUGHES Residence. As of May 31, 2023, the phone number on file for HUGHES"s customer profile was the 9653 Number.

---

[29] https://www.novabtm.com/home (last viewed July 20, 2023).

[30] https://www.novabtm.com/how-to-buy-sell-bitcoin (last viewed July 20, 2023).

87.     On or about June 28, 2023, from approximately 2:51 p.m. to 2:53 p.m., HUGHES, using HUGHES Telegram Account 1, exchanged the following text messages with UC2:

| APPROXIMATE TIME | SPEAKER | CONVERSATION |
|---|---|---|
| 2:51 p.m. | UC2 | gimme the news can you get that out today? |
| 2:53 p.m. | HUGHES | I'm waiting on the homie to bring it I'm bout 95 percent |
| 2:53 p.m. | UC2 | cool |
| 2:53 p.m. | HUGHES | U know I got you |

88.     Based on my training, experience, and knowledge of the investigation, I believe that in the above exchange: (1) UC2 asked HUGHES if HUGHES could ship the one pound of methamphetamine that same day (June 28, 2023); (2) HUGHES responded that he was waiting on his source of supply ("the homie") to drop off additional methamphetamine to HUGHES.

89.     On or about June 28, 2023, commencing at approximately 3:36 p.m., law enforcement officials conducing physical surveillance of HUGHES observed the following:

a.      At approximately 3:36 p.m., HUGHES exited the Westfield Valley Mall and departed the area.

b.      At approximately 4:33 p.m., HUGHES parked the HUGHES Vehicle at a supermarket located on the 3800 block of Monterey Road in San Jose, California. Inside the parking lot, HUGHES spoke with an unknown male subject and

35

entered the passenger seat of a Honda Accord. At approximately 4:37 p.m. HUGHES exited the Honda Accord.

c. At approximately 4:38 p.m., the Honda Accord exited the supermarket parking lot. At approximately 4:41 p.m., the Honda Accord returned to the supermarket parking lot and parked adjacent (driver's side window to driver's side window) to the HUGHES Vehicle. HUGHES and the unknown male briefly spoke through the open windows of their respective vehicles. At approximately 4:42 p.m., the HUGHES Vehicle and Honda Accord departed the area.

d. After leaving the supermarket parking lot, HUGHES drove the HUGHES Vehicle northbound on Highway 101.

90. At approximately 5:32 p.m., in response to the DEA's request for assistance in executing the Arrest Warrant, the Redwood City Police Department ("RCPD") in Redwood City, California staged a patrol vehicle near Highway 101. According to an RCPD report, upon seeing the HUGHES Vehicle enter Redwood City, an RCPD officer observed that the HUGHES Vehicle was missing a front license plate and had tinted front windows in violation of the California Vehicle Code.

91. The RCPD conducted a traffic stop of the HUGHES Vehicle on Highway 101 between the Whipple Avenue and Holly Street exits and confirmed through photo identification that HUGHES was the person driving the HUGHES Vehicle,[31] the RCPD arrested HUGHES pursuant to the Arrest Warrant and took him into custody.

---

[31]    HUGHES was in possession of his California driver's license.

92.     Within approximately 15 minutes of the RCPD's investigative stop of the HUGHES Vehicle, an RCPD K-9 Officer and a certified K-9 named Chacho arrived at the scene. Chacho conducted an open-air sniff of the HUGHES Vehicle and positively alerted to the presence of narcotics inside the vehicle.

93.     After the positive K-9 alert to the presence of narcotics inside the HUGHES Vehicle, the RCPD inventoried the contents of the HUGHES Vehicle at the scene of the investigatory stop. The RCPD seized the following items from the glove box:

a.     Approximately 781.2 grams of a white crystalline substance. The substance field-tested positive for the presumptive presence of methamphetamine, and DEA laboratory results are pending.

b.     Approximately 34.8 grams of a white powdery substance. The substance field-tested positive for the presumptive presence of cocaine, and DEA laboratory results are pending.

c.     A loaded Polymer80 semi-automatic "ghost gun" handgun.[32]

d.     A loaded Glock gun magazine.

e.     A digital scale.

94.     The RCPD seized the following additional items from inside the HUGHES Vehicle:

a.     Approximately $4,206 in U.S. Currency.

---

[32]     A "ghost gun" is a privately made firearm that does not display a serial number.

37

      b.     The **Subject Phone**, located on the front passenger seat.

      c.     A second cellular phone, located on the front passenger seat; and

      d.     The **Subject Computer**, located in the rear pocket of the front passenger seat.

      e.     Approximately 42 empty small plastic bags.

      f.     Gloves, packaging tape, and a pair of scissors with a white powdery residue.

      g.     A mini CD disc, or "pocket CD."

95.    The RCPD found the following items inside the trunk of the HUGHES Vehicle:

      a.     A FoodSaver brand vacuum sealing machine.

      b.     A credit card scanner with blank credit cards.

      c.     Unused United States Postal Service boxes.

85.    The RCPD placed the **Subject Phone** into "airplane mode" to disconnect the **Subject Phone** from the cellular network and preserve evidence on the **Subject Phone**.  Location data for the **Subject Phone** reflects that, on or about June 28, 2023 at approximately 6:02 p.m., the **Subject Phone** was in the vicinity of the RCPD's investigative stop of HUGHES.[33]

86.    On or about June 28, 2023 at approximately 8:20 p.m., I placed a telephone call to the **Subject Phone** from my law enforcement telephone number.

---

[33]    According to Verizon, the location data had a radius of approximately 538 meters.

Verizon's toll records for the **Subject Phone** reflect that the **Subject Phone** received an incoming call from my law enforcement telephone on the same date and approximate time.[34]

87.     Following HUGHES's arrest, law enforcement officials provided HUGHES his *Miranda* rights, and HUGHES agreed to speak with law enforcement officers without an attorney present. The interview was audio and video recorded.  During the interview, HUGHES denied that he distributed any narcotics.  HUGHES did not identify his telephone numbers or describe the **Subject Computer** during the interview.

88.     On or about June 30, 2023, the RCPD interviewed Individual A, who identified herself as a relative of HUGHES, at the Redwood City Police Department. The interview was audio and video recorded.  The RCPD told Individual A that she was not under arrest and was free to leave[35]. During the interview, Individual A stated that she purchased the HUGHES Vehicle for HUGHES and did not drive the vehicle. She further stated that the firearm and narcotics the RCPD seized from the HUGHES Vehicle did not belong to her, and that she did not store any possessions inside the HUGHES Vehicle.

89.     The **Subject Computer's** front inside cover displays a MacBook Air logo that mirrors the MacBook Air logo depicted in the photograph HUGHES texted to the UC on or about April 13, 2023, as described in paragraph 22 above.  HUGHES April 13,

---

[34]     The **Subject Phone** did not audibly ring due to its placement in airplane mode.

2023 text message contained an image of a MacBook Air computer screen depicting the UC's message to the Provolonemacaroni Store Account for a sample of methamphetamine. A photograph of the **Subject Computer** is below.

**<u>Inside Cover of the Subject Computer</u>**



**MacBook Air Logo Depicted in the Photograph HUGHES Texted to <u>the UC on or about April 13, 2023</u>**



---

[35]      The RCPD did not *Mirandize* Individual A.

90.     According to Block Inc.'s records, a Visa card that HUGHES used to pay the postage for the April 6, 2023, April 14, 2023, and May 1, 2023 Parcels is associated with a CashApp account that utilized the e-mail address provolonemacaroni@icloud.com.[36]

91.     According to Apple Inc.'s records, the provolonemacaroni@icloud account utilized a MacBook Air device to access the provolonemacaroni@icloud account from approximately April 29, 2023 through approximately May 18, 2023, (the date the government requested records from Apple). Apple's records identify the device associated with the provolonemacaroni@icloud account as "MacBookAir10,1."

92.     On or about July 10, 2023, I entered the serial number of the **Subject Computer** into a page on Apple's website that permits a customer to identify a device's warranty coverage.[37] Apple's website identifies the **Subject Computer** as a "MacBook Air (M1, 2020)" purchased in approximately August 2021. On the webpage titled "Identify your MacBook Air model," Apple's website identifies the MacBook Air (M1, 2020) computer as model MacBookAir10,1.[38] Accordingly, I believe that the **Subject Computer** is the same MacBook Air computer that accessed the provolonemacaroni@icloud account and that there is probable cause to believe that evidence of narcotics trafficking offenses is contained in the **Subject Computer**.

---

[36]     CashApp is a phone application that permits the user to send or receive money.

[37]     https://checkcoverage.apple.com/coverage (last viewed July 20, 2023).

[38]     https://support.apple.com/en-us/HT201862 (last viewed July 20, 2023).

93.     At the time of HUGHES's June 28, 2023 arrest, data stored on the **Subject Phone**, including text and voice mail messages sent and received by HUGHES during the course of the commission of the narcotics offenses, were not known.

94.     On or about June 30, 2023, the RCPD transferred custody of the **Subject Phone**, the **Subject Computer**, the second cellular phone, the mini CD disc, and approximately $4,206 in U.S. Currency that the RCPD seized from the HUGHES Vehicle to me. Since on or about June, 30 2023, these items have been in the custody of the Evanston Police Department.

## II.     BACKGROUND INFORMATION

96.     Through training, experience, and discussions with other experienced agents, I know that:

        a.     Drug traffickers commonly maintain books, papers, files, and other records which reflect the names, addresses and/or telephone numbers of their suppliers, couriers, customers, and other associates in the illegal drug trade.

        b.     Drug traffickers maintain books, records, receipts, notes, ledgers, airline tickets, money orders, and other files relating to the purchase, packaging, sale, distribution, and transportation of their product.

        c.     Drug traffickers conceal in their residences and/or places of business the proceeds of their illegal activity, including large amounts of United States currency, financial instruments, precious metals, jewelry, rare coins, works of art, and

other items of value, as well as books and records regarding the acquisition, use, and disposition of such items of value.

      d.    When drug traffickers amass large proceeds from the sale of controlled substances, they attempt to legitimize these profits, often accomplishing this goal by using the services of banks, other financial institutions, and real estate brokers; and maintain books and papers related to such efforts.

      e.    It is common for drug traffickers to maintain the aforementioned books, papers, and documents in secure places within their residences and/or places of business so that the drug traffickers have ready access to such information.

      f.    Drug traffickers frequently take, or cause to be taken, photographs of themselves, their associates in the drug trade, property acquired from the distribution of drugs, and their product, and such photographs are often kept in their residences and/or places of business. Drug traffickers often place assets, including real and personal property, such as vehicles, in names other than their own to avoid the detection and forfeiture of such assets by government agencies; and that the drug traffickers continue to use these assets and to exercise dominion and control over them even though the assets are nominally owned by others.

43

## III. SPECIFICS REGARDING SEARCHES OF ELECTRONIC STORAGE MEDIA

97.     Based upon my training and experience, and the training and experience of specially trained personnel whom I have consulted, searches of evidence from electronic storage media commonly require agents to download or copy information from the electronic storage media and their components, or remove most or all electronic storage media items (*e.g.* computer hardware, computer software, computer-related documentation, and cellular telephones) to be processed later by a qualified computer expert in a laboratory or other controlled environment. This is almost always true because of the following:

a.      Electronic storage media can store the equivalent of thousands of pages of information. Especially when the user wants to conceal criminal evidence, he or she often stores it with deceptive file names. This requires searching authorities to examine all the stored data to determine whether it is included in the warrant. This sorting process can take days or weeks, depending on the volume of data stored, and it would be generally impossible to accomplish this kind of data search on site.

b.      Searching electronic storage media for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert should analyze the system and its data. The search of an electronic storage media system is an exacting scientific procedure which is designed to protect

44

the integrity of the evidence and to recover even hidden, erased, compressed, password-protected, or encrypted files. Since electronic storage media evidence is extremely vulnerable to tampering or destruction (which may be caused by malicious code or normal activities of an operating system), the controlled environment of a laboratory is essential to its complete and accurate analysis.

98. In order to fully retrieve data from a computer system, the analyst needs all storage media as well as the computer. The analyst needs all the system software (operating systems or interfaces, and hardware drivers) and any applications software which may have been used to create the data (whether stored on hard disk drives or on external media).

99. In addition, electronic storage media such as a computer, its storage devices, peripherals, and Internet connection interface may be instrumentalities of the crime(s) and are subject to seizure as such if they contain contraband or were used to carry out criminal activity.

## IV.   PROCEDURES TO BE FOLLOWED IN SEARCHING ELECTRONIC STORAGE MEDIA

100. Pursuant to Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure, this warrant will authorize the removal of electronic storage media and copying of electronically stored information found in the premises described in Attachment A so that they may be reviewed in a secure environment for information consistent with the warrant. That review shall be conducted pursuant to the following protocol.

101.   The review of electronically stored information and electronic storage media removed from the premises described in Attachment A may include the following techniques (the following is a non-exclusive list, and the government may use other procedures that, like those listed below, minimize the review of information not within the list of items to be seized as set forth herein):

a.   examination of all the data contained in such computer hardware, computer software, and/or memory storage devices to determine whether that data falls within the items to be seized as set forth in Attachment B;

b.   searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth in Attachment B (any data that is encrypted and unreadable will not be returned unless law enforcement personnel have determined that the data is not (1) an instrumentality of the offenses, (2) a fruit of the criminal activity, (3) contraband, (4) otherwise unlawfully possessed, or (5) evidence of the offenses specified above);

c.   surveying file directories and the individual files they contain to determine whether they include data falling within the list of items to be seized as set forth in Attachment B;

d.   opening or reading portions of files, and performing key word searches of files, in order to determine whether their contents fall within the items to be seized as set forth in Attachment B.

46

102.    The government will return any electronic storage media removed from the premises described in Attachment A within 30 days of the removal unless, pursuant to Rule 41(c)(2) or (3) of the Federal Rules of Criminal Procedure, the removed electronic storage media contains contraband or constitutes an instrumentality of crime, or unless otherwise ordered by the Court.

## V. CONCLUSION

103. Based on the above information, I respectfully submit that there is probable cause to believe that narcotics offenses, in violation of Title 21, United States Code, Sections 841 and 846, have been committed, and that evidence relating to this criminal conduct, as further described in Attachment B, will be found in the Subject Computer, as further described in Attachment A. I therefore respectfully request that this Court issue a search warrant for the **Subject Computer** more particularly described in Attachment A, authorizing the seizure of the items described in Attachment B, pursuant to the protocol described in the addendum to Attachment B.

FURTHER AFFIANT SAYETH NOT.

_____
Mikhail Geyer
Task Force Officer
Drug Enforcement Administration

Sworn to and affirmed by telephone this 24th day of July, 2023

_____
Honorable SUNIL R. HARJANI
United States Magistrate Judge

48

## ATTACHMENT A

## DESCRIPTION OF ITEM TO BE SEARCHED

A silver Apple MacBook Air laptop computer, bearing serial number FVFG5P5QQ6L4.

**ATTACHMENT B**

**LIST OF ITEMS TO BE SEIZED**

Evidence concerning violation of Title 21, United States Code, Sections 841(a)(1) and 846, as follows:

1.      Items, including electronic records, information, digital photographs and videos, or communications, pertaining to the use, ownership, or control of **Subject Computer**.

2.      Items, including electronic records, information, digital photographs and videos, or communications pertaining to:   (a) controlled substances; (b) drug paraphernalia; (c) narcotics packaging; (d) U.S. Postal Service records; (e) the Nemesis Market; (f) Hughes Telegram Account 1 and Hughes Telegram Account 2; (g) the use of cryptocurrency, including digital wallets and bitcoin ATMs; (h) any NovaBTM account; (i) the use of digital applications to send or receive bitcoin proceeds; (i) the Provolonemacaroni Store Account, including direct messages with the account and advertising; and (j) any other association with the moniker, "provolonemacaroni," including the use of e-mail addresses with that moniker.

3.      Items, including electronic records, information, digital photographs and videos, or communications pertaining to the identities of participants and/or co-conspirators involved in, or witnesses to, the **Subject Offenses**.

4.      Items related to the physical location of the **Subject Computer** at or near the times of the **Subject Offenses**.

## ADDENDUM TO ATTACHMENT B

The government's review of electronic storage media, including cell phones, already in its possession shall be conducted pursuant to the following protocol:

The government must make reasonable efforts to use methods and procedures that will locate those categories of data, files, documents, or other electronically stored information that are identified in the warrant, while minimizing exposure or examination of categories that will not reveal the items to be seized in Attachment B.

The review of electronically stored information and electronic storage media described in Attachment A may include the below techniques. These techniques are a non-exclusive list, and the government may use other procedures if those procedures are designed to minimize the review of information not within the list of items to be seized as set forth in Attachment B:

a. examination of categories of data contained in such computer hardware, computer software, and/or memory storage devices to determine whether that data falls within the items to be seized as set forth in Attachment B;

b. searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth in Attachment B;

c. surveying various file directories and folders to determine whether they include data falling within the list of items to be seized as set forth in Attachment B;

d. opening or reading portions of files, and performing key word or concept searches of files, in order to determine whether their contents fall within the items to be seized as set forth in Attachment B; and

e. using forensic tools to locate data falling within the list of items to be seized as set forth in Attachment B.

Law enforcement personnel are not authorized to conduct additional searches for any information beyond the scope of the items to be seized by this warrant as set forth in Attachment B. To the extent that evidence of crimes not within the scope of this warrant appears in plain view during the government's review, the government shall submit a new search warrant application seeking authority to expand the scope of the search prior to searching portions of that data or other item that is not within the scope of the warrant. However, the government may continue its search of that same data or other item if it also contains evidence of crimes within the scope of this warrant.